UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-30105-MAP

BOBBY T. BROWN
    Plaintiff

vs

F.L. ROBERTS AND COMPANY, INC.
dba JIFFY LUBE
    Defendant

DEPOSITION OF JOHN P. BORGATTI, taken before ANN A. PRESTON, Notary Public and Court Reporter, pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, at the offices of Heisler, Feldman, and McCormick, PC, 1145 Main Street, Springfield, Massachusetts, commencing at 3:10 on December 8, 2004.

Ann A. Preston
Certified Shorthand Reporter

REAL-TIME COURT REPORTING
244 Bridge Street      807 Main Street
Springfield, MA 01108      Worcester, MA 01610
413.732.1157      508.612.3432

```
 1         Q.    Even though Mr. Smith runs both the
 2   Jiffy Lube and the car wash?
 3         A.    Correct, correct.
 4         Q.    Okay?
 5         A.    The retail gas and convenient store
 6   division.  Then there's a wholesale division; it's
 7   a small division of wholesale gasoline and oil
 8   where it's basically a dispatcher, and I believe
 9   four or five truck drivers.
10         Q.    So you do all the benefit stuff for all
11   the divisions?
12         A.    Correct.
13         Q.    And you also handle court cases that
14   come up as a result of personnel complaints?
15         A.    Yes.
16         Q.    Are there any other court cases you're
17   involved in?
18         A.    There are, yes.
19         Q.    I guess I'm curious to know what your
20   role is in the court cases that come up.
21         A.    I like to describe it as a communicator.
22   You know, whether it be with an attorney, with the
23   division heads, managers, supervisors, someone that
```

```
 1   helps in gathering facts and things within each of
 2   these divisions.
 3        Q.   How many court cases have you been
 4   involved with since you have had this job?
 5        A.   Actual court cases?
 6        Q.   Well, let's say complaints either in
 7   court or with an administrative agency of some
 8   sort.
 9        A.   Maybe half a dozen.
10        Q.   How many discrimination cases?
11        A.   Half or a little more of that.  Three,
12   four, five, in there.  I don't remember all of
13   them.
14        Q.   You don't remember all of them?
15        A.   No.
16        Q.   Three years, I just thought you might
17   actually know -- since there are so few, you might
18   actually know what each one was.
19        A.   It seems they sometimes take a long
20   time, so it feels it's more than it is.
21        Q.   Have you had any other religious
22   discrimination cases other than Bobby Brown's?
23        A.   I have not.
```

```
 1    Inc.?
 2         A.   Steve Goudreau and Greg Byler.
 3         Q.   How do you spell by Byler, do you know?
 4         A.   B-Y-L-E-R, I believe.
 5         Q.   Were you there when Power, Inc.
 6    explained what the basis was for making the change?
 7         A.   I don't believe I was.
 8         Q.   When the change was made at the Jiffy
 9    Lubes, were the other operations directors notified
10    of that change?
11         A.   From other divisions?
12         Q.   I hope I'm using the right terminology,
13    I'm sorry.
14         A.   That's okay.
15         Q.   The Jiffy Lubes made that change.  Car
16    washes made the same change?
17         A.   Car washes did, yes.
18         Q.   Did the convenience and gas station
19    people make the same change?
20         A.   No, they didn't.
21         Q.   Do you know why they didn't?
22         A.   I believe it was Carol Voyik not wanting
23    to, who was the V.P. of operations.
```

1    Q.   What makes you think that was the
2  reason?
3    A.   Because I did a handbook with her.
4    Q.   Did you discuss this possibility with
5  her of putting this new policy into effect that --
6    A.   Yes, she didn't care for it.
7    Q.   Why, what did she say about it?
8    A.   We were a bigger division.
9    Q.   Who was a bigger division?
10   A.   Retail convenience stores, a larger
11 division. More employees, and I think it was she
12 didn't necessarily want to go there. She didn't
13 work with Power, Inc. She wasn't interested in
14 hiring them as Richard was.
15   Q.   Did you explain to her what the reason
16 was for instituting it at the Jiffy Lubes?
17   A.   I may have spoke about it but didn't
18 really get into detail. What we were trying to
19 establish was a handbook for the convenience
20 stores.
21   Q.   That's three of the divisions. So the
22 wholesale division, was there a handbook?
23   A.   They have one which was made by the

```
 1    dispatcher/wholesale manager.
 2         Q.    Did you help with that handbook?
 3         A.    No, I did not.
 4         Q.    Did that division manager know about the
 5    change at Jiffy Lube and the facial hair policy?
 6         A.    I'm not certain.
 7         Q.    Is there anything else you remember
 8    about the discussions with -- Carol is her first
 9    name?
10         A.    Yes.
11         Q.    -- with Carol concerning why she would
12    or would not want to institute the no facial hair
13    policy; do you remember anything else than what
14    you've told us now about the conversation?
15         A.    I'm not certain, but she may have been
16    worried about retaining employees or current
17    employees that may have had facial hair.
18         Q.    Do you know if she talked to Mr. Smith
19    about the change that he was making at his
20    operation?
21         A.    I don't know.
22         Q.    There's also a diner up on Route 91
23    that's owned by F.L. Roberts?
```

```
 1           A.    Yes.
 2           Q.    What division does that fall under?
 3           A.    Under Carol, the retail convenience
 4    store and gas.  It's under the same property as a
 5    truck stop store with gasoline and diesel.
 6           Q.    And that's got a restaurant attached to
 7    it, right?
 8           A.    Yes.
 9           Q.    And those people can have facial hair?
10           A.    Yes, they can.
11           Q.    Was there any discussion about how
12    customer perception of a food establishment,
13    whether they might be more concerned about facial
14    hair in such a place than an oil changing
15    operation?
16           A.    I never had a discussion with anyone
17    about that.
18           Q.    Did you express an opinion about that to
19    anybody?
20           A.    No, I didn't.
21                 MR. FELDMAN:  I'm going to take a
22           quick break because I just got your
23           signed copy of interrogatories.
```

```
 1   because of his religious practice?
 2        A.   Not prior to the complaint.
 3        Q.   Is that something that Mr. Smith should
 4   have told you, given the usual policy at F.L.
 5   Roberts?
 6             MS. THOMPSON:  Objection.
 7             THE WITNESS:  Not necessarily.
 8        Q.   (By Mr. Feldman)  So after the facial
 9   hair policy was changed -- strike that.  You could
10   still -- under the new policy, you could still have
11   your facial hair, but you had to work in the lower
12   bay, is that correct?
13             MS. THOMPSON:  Objection, but go
14        ahead.
15             THE WITNESS:  That's my
16        understanding.
17        Q.   (By Mr. Feldman)  At that time?
18        A.   At that time, yes, if someone didn't
19   want to shave, they could still have their job and
20   work as a lower bay technician.
21        Q.   Has anyone ever asked for a reasonable
22   accommodation from the company since you've worked
23   there?
```

```
1       A.   I went to Mr. Smith to gather whatever
2  information I could.
3       Q.   That's the first thing that you remember
4  doing when you received that?
5       A.   Yes.
6       Q.   "That" being Smith Exhibit 10?
7       A.   Yes.
8       Q.   At this point, when you received Smith
9  Exhibit 10, did you understand that Bobby Brown was
10 a Rastafarian?
11      A.   Yes.
12      Q.   Did you understand that he believed he
13 was being discriminated against because of his
14 religion?
15      A.   Yes.
16      Q.   Did you know that he had asked -- after
17 you talked to Mr. Smith or just in response to
18 that, did you know that he wanted to continue to
19 work upstairs and that Mr. Smith had said no?
20      A.   Yes.
21      Q.   Given that you understood that, why
22 didn't you then allow him to work upstairs after
23 you received this complaint, Smith Number 10?
```

```
1   shaven.  And in this case or incident of alleged
2   discrimination, the reasonable accommodation, I
3   didn't know it was for religious purposes.  He
4   asked Mr. Smith if he could continue working there,
5   he didn't want to shave.  Mr. Smith already said to
6   him that, You can continue to work here, you can
7   work in the lower bay as a lower bay technician,
8   and Mr. Brown agreed.
9          Q.   But the policy was not no one at Jiffy
10  Lube is permitted to have a beard, right; the
11  policy was only people with customer contact can't
12  have a beard, isn't that correct?
13         A.   Correct.
14         Q.   So that means the people working in the
15  lower bay are allowed to have beards, isn't that
16  right?
17         A.   Yes.
18         Q.   So the policy -- what was done for
19  Mr. Brown was completely in accordance with the
20  policy, isn't that right?
21         A.   Yes.
22         Q.   In other words, Mr. Smith was following
23  the policy by having Mr. Brown work in the lower
```

```
 1  bay?
 2      A.   Yes.
 3      Q.   So how is that a reasonable
 4  accommodation when you're following the policy?
 5      A.   I think it's a twist of words.  I'm
 6  sorry, but...
 7      Q.   That's okay.  Let's use the example of
 8  reasonable accommodation with the landlord I
 9  discussed.  The rule in that case is no pets,
10  right.  So if you follow the policy and the blind
11  person says, I want to have my seeing eye dog, then
12  they're told, No, you can't, right, that's
13  following the policy?
14              MS. THOMPSON:  I'm going to object
15          to this.  I think it all hinges on the
16          definition of reasonableness, and I
17          don't believe this witness can address
18          that.  That's ultimately the question
19          for the trier of fact as to what was
20          reasonable or not.  We can ask John
21          that and engage in semantics, but I
22          don't think it's his to answer.
23      Q.   (By Mr. Feldman)  In the example with
```