UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-30105-MAP

BOBBY T. BROWN
    Plaintiff

vs

F.L. ROBERTS AND COMPANY, INC.
dba JIFFY LUBE
    Defendant

DEPOSITION OF RICHARD C. SMITH, taken before ANN A. PRESTON, Notary Public and Court Reporter, pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, at the offices of Heisler, Feldman, and McCormick, PC, 1145 Main Street, Springfield, Massachusetts, commencing at 10:00 on December 8, 2004.

Ann A. Preston
Certified Shorthand Reporter

REAL-TIME COURT REPORTING
244 Bridge Street      807 Main Street
Springfield, MA  01108      Worcester, MA  01610
413.732.1157      508.612.3432

```
1        A.    241 Wolf Swamp Road, Longmeadow, Mass.
2        Q.    Are you married?
3        A.    Yes.
4        Q.    Do you have children?
5        A.    Yes.
6        Q.    How many children do you have?
7        A.    I've got six children.  I adopted four
8  and I've got a stepson.
9        Q.    What's your current occupation?
10       A.    Vice President of Operations of
11 F.L. Roberts car wash and Jiffy Lube divisions.
12       Q.    How long have you been doing that job?
13       A.    As the vice president?
14       Q.    Yes.
15       A.    Three years -- three to four years.
16       Q.    How far did you go in school?
17       A.    Graduated high school, took courses at
18 Framingham State College, and that's it.
19       Q.    Did you get a degree of any sort?
20       A.    No.
21       Q.    How long have you been employed by
22 F.L. Roberts in total?
23       A.    Twenty years.
```

```
1    from this policy with anybody, as far as you know,
2    before the meeting in December '01?
3              MS. THOMPSON:  Did you say
4         exemption?
5              MR. FELDMAN:  Exception from the
6         policy.
7         A.   What do you mean?
8         Q.   I mean saying that the policy shouldn't
9    have to apply to me, clean shaven policy?
10        A.   Not that I know of.
11        Q.   When did you learn about Bobby Brown's
12   religion?
13        A.   I had a meeting with him -- second
14   meeting I had with him about this issue -- there
15   was a note because I read my -- I had to write him
16   a statement two years ago, so refresh me a little
17   bit.  On my second meeting with him, he told me
18   that he was Raspatarian or...
19        Q.   Rastafarian.
20        A.   He may not have told me he was Raf --
21   he may have said my religious beliefs.  I'm not
22   even sure if he told me what he was.
23        Q.   So he said something like because of his
```

```
 1   religious beliefs?
 2       A.   Yes, he said, I can't shave my beard
 3   because of my religious beliefs.
 4       Q.   What did you say to him?
 5       A.   And that he thought I was discriminating
 6   against him.  I said, Bobby, you can still work for
 7   us; you can work downstairs all day.
 8       Q.   What did he say to that?
 9       A.   He said, you know, I don't really want
10   to work downstairs.  Something like, you know.
11       Q.   He said something about his religious
12   beliefs, and he said, I don't really want to work
13   downstairs, and you said...
14       A.   I thought we were making a reasonable
15   accommodation for him by letting him stay working
16   for us, that he could go downstairs.
17       Q.   What did he say?
18       A.   He made a comment.  I forget what he
19   said, to tell you the truth.
20       Q.   Do you know if he said the name of his
21   religion during that meeting?
22       A.   I don't remember.
23       Q.   But he said something about his
```

```
1    religious beliefs, is that right?
2         A.   Yes, he did.  He told me he couldn't
3    shave it.
4         Q.   I'm sorry, say that again?
5         A.   He said he couldn't shave.
6         Q.   Because of his religious beliefs?
7         A.   Yes, second meeting we had.
8         Q.   When was that second meeting?
9         A.   I don't know.  I forget.  I gave
10   something to you.  You should have gotten something
11   from us.
12        Q.   I do have it.
13        A.   I think it was in March maybe.
14             MR. FELDMAN:  I can introduce that;
15        that's fine.
16             (Exhibit 8, 10/2/02 Letter to
17             F.L. Roberts from R. Smith,
18             marked for identification)
19        Q.   (By Mr. Feldman)  I'm showing you what's
20   been marked as Exhibit 8 because you just asked
21   about a statement that you wrote up.  Is that the
22   statement that you're referring to?
23        A.   Yes.
```

```
 1        Q.   That was written in October of 2002, is
 2   that correct?
 3        A.   Correct.
 4        Q.   So even this was about ten months after
 5   the incident we're talking about?
 6        A.   Yes.
 7        Q.   How was your memory of the events at
 8   that time you wrote this statement?
 9        A.   A little better.
10        Q.   Better than now?
11        A.   Yes.
12        Q.   Was it good at that time; was it a good
13   memory of the events that had occurred?
14        A.   I don't know what you consider good, so
15   I don't know.
16        Q.   Were there two separate meetings about
17   this with Bobby Brown, or could it all have
18   occurred at one meeting?
19        A.   No, there were two different meetings.
20        Q.   Are you sure about that?
21        A.   Oh, yes.
22        Q.   This first time you talked to Bobby was
23   at that Hadley meeting we discussed in December,
```

```
 1        Q.   That was written in October of 2002, is
 2   that correct?
 3        A.   Correct.
 4        Q.   So even this was about ten months after
 5   the incident we're talking about?
 6        A.   Yes.
 7        Q.   How was your memory of the events at
 8   that time you wrote this statement?
 9        A.   A little better.
10        Q.   Better than now?
11        A.   Yes.
12        Q.   Was it good at that time; was it a good
13   memory of the events that had occurred?
14        A.   I don't know what you consider good, so
15   I don't know.
16        Q.   Were there two separate meetings about
17   this with Bobby Brown, or could it all have
18   occurred at one meeting?
19        A.   No, there were two different meetings.
20        Q.   Are you sure about that?
21        A.   Oh, yes.
22        Q.   This first time you talked to Bobby was
23   at that Hadley meeting we discussed in December,
```

```
 1    right?
 2         A.    Yes.
 3         Q.    And the second one, where did it happen?
 4         A.    It happened outside at the car wash bay
 5    at Hadley Jiffy Lube.  We have three bays, and we
 6    have a car wash bay where we do extra services, and
 7    he called me over there.
 8         Q.    And he said he thought that you were
 9    discriminating against him, is that right?
10         A.    I don't think he said that.
11         Q.    Well, that's what you said.
12         A.    Is that what I said?
13         Q.    Yes.  Do you want to read your
14    statement again?
15         A.    Yes.
16         Q.    So he said that -- did he say that he
17    thought you were discriminating against him?
18         A.    I guess so, yes.
19         Q.    He said that he wanted to work other
20    jobs, is that what he told you?
21         A.    Yes.
22         Q.    And that he didn't want to shave his
23    beard, is that right?
```

```
1         A.    That's correct.
2         Q.    And he didn't want to shave his beard
3   because of his religious believes, is that correct?
4         A.    Yes, that's what he said.
5         Q.    Your response was that, You had to work
6   in the lower bay tech, because that's what it says
7   in the employee handbook?
8               MS. THOMPSON:  Objection.
9         Q.    (By Mr. Feldman)  Strike that.  In
10  response to him saying it, you reminded him of your
11  prior conversation that he could only work as the
12  lower bay tech as it is stated in the employee
13  handbook?
14        A.    Yes.
15        Q.    Is that what you told him?
16        A.    Sounds right, yes, sure.
17        Q.    I'd like you to discuss what he said to
18  you at the December '01 meeting.  Do you remember
19  that?
20        A.    Not other than the fact that it was a
21  typical thing that I heard from a lot of employees.
22        Q.    What did he say?
23        A.    I don't want to shave my beard.  I don't
```

1   want to shave.
2       Q.   When you described the policy of facial
3   hair at that December meeting, you told the
4   employees that if you don't want to shave, then you
5   don't get customer contact, right, is that what you
6   told them?
7       A.   I read the handbook.  That's exactly
8   what we did.
9       Q.   The handbook says that if you want
10  customer contact -- I'm paraphrasing -- then you
11  have to be clean shaven, right?
12      A.   That's correct.
13      Q.   And if you don't shave, then you don't
14  get customer contact, right?
15      A.   Yes.
16      Q.   Did you say you're going to get fired if
17  you don't shave?
18      A.   It's in the handbook that if you don't
19  shave, if you come to work not shaven, that you can
20  lose your job over it, yes -- that you can be
21  reprimanded over it, sure.
22      Q.   We just said if you don't want to shave,
23  you could still work as a lower bay tech, right --

1  strike that. What we said was, If you don't shave,
2  you just lose your customer contact, right?
3       A.   Right, but if you come to work and you
4  don't shave and you're not downstairs, then you can
5  lose your job. We had quite a few employees who
6  didn't want to shave and they said, well, I'll work
7  downstairs.
8       Q.   I understand that. What I'm saying,
9  just to be clear, is that when you had this meeting
10 in December, you explained the policy so that
11 everyone understood or should have understood that
12 if you don't want to shave, you can still work with
13 the company but you'll be a lower bay tech, is that
14 correct?
15            MS. THOMPSON:   I'll object to form.
16      Q.   (By Mr. Feldman)  Is it the policy or am
17 I wrong?
18      A.   Any customer contact person has to be
19 clean shave. If you don't shave, you can lose your
20 job.
21      Q.   Understood, but what if I said to you,
22 Okay, I don't want to shave; I'll be a lower bay
23 tech?

1  A. Then that was okay.
2  Q. Did you explain that to everybody at the
3  Hadley meeting?
4  A. Yes. I read from the handbook. I think
5  if you read the handbook, it says that.
6  Q. Yes, it does say that. I know that's
7  what it said. But at the meeting, did you ever say
8  if you choose to be in the lower bay tech and you
9  choose not to shave, you can be fired still?
10 A. I don't know. I don't know what I said.
11         MS. THOMPSON: If you choose to be
12     in the lower bay and...
13         MR. FELDMAN: And that you don't
14     want to shave.
15         MS. THOMPSON: That you could be
16     fired?
17 Q. (By Mr. Feldman) Yes. That's not the
18 policy, right; the policy was that you could be in
19 the lower bay and not shave?
20 A. Oh, yeah.
21 Q. The reason I'm saying all that is you're
22 saying after this meeting -- Bobby Brown came up to
23 you after the meeting, right?

```
 1   Jiffy Lube?
 2        A.    I believe so, yes.
 3        Q.    Was this used for all F.L. Roberts'
 4   employees?
 5        A.    Yes.  I think it's a law.
 6        Q.    Just so I'm clear, in 2001, what were
 7   the different kind of businesses F.L. Roberts was
 8   running?
 9        A.    2001?
10        Q.    Yes.
11        A.    We had car washes, gas stations, Jiffy
12   Lubes, diner, hotel.
13        Q.    Where is the diner?
14        A.    In Whately.
15        Q.    Do you have anything to do with that
16   diner?
17        A.    No.
18        Q.    Who runs that diner?
19        A.    That's runs by a gasoline person,
20   convenience store, Carol Voyik.
21        Q.    The facial hair policy, did that apply
22   across all F.L. Roberts businesses?
23        A.    No, just the two divisions that I ran,
```

REAL-TIME COURT REPORTING
244 Bridge Street                    807 Main Street
Springfield, MA  01108              Worcester, MA  01610
413.732.1157                             508.612.3432

```
 1  because I hired Power to work for me.
 2       Q.   Who do you report to?
 3       A.   Steven Roberts.
 4       Q.   What's his position?
 5       A.   He's the president and owner of F.L.
 6  Roberts.
 7       Q.   So there's no one between you and him?
 8       A.   No.
 9       Q.   Did you tell him about the facial hair
10  policy change?
11       A.   I'm sure I did.  I mean, I don't recall
12  going to him and where I was, but I told him, sure.
13  I told him everything that was going on with the
14  changes.
15       Q.   Do you know why that wasn't implemented
16  across the board at all businesses owned by F.L.
17  Roberts?
18       A.   No, because I told you, I hired Power to
19  work for me, so it was just car wash and Jiffy
20  Lube.
21       Q.   I understand that part, but you said you
22  told the CEO of the whole company about it, right?
23       A.   Yes.
```

```
 1        Q.   If you know, why wasn't it implemented
 2   at the other businesses F.L. Roberts ran?
 3        A.   It was never brought up, I don't know.
 4        Q.   Do you know why, for example, they
 5   wouldn't say all gas station attendants have to
 6   have no facial hair or why the waitresses, waiters,
 7   cooks, whoever, can't have nose -- or anything --
 8   facial hair?
 9        A.   I don't know.  I never really -- it
10   wasn't a policy that they had.  We had different
11   policies in different divisions.
12        Q.   How do you know that that's not the
13   policy?
14        A.   Because I know it's not.  If you go to
15   our stores, you see people with beards and rings, I
16   mean, it's different.
17        Q.   Why is it different?
18        A.   Because somebody else runs the division.
19   We do some things different in the Jiffy Lubes
20   and car washes than they do in the gasoline -- it's
21   different businesses.
22        Q.   Did you share this information about the
23   facial hair policy with anyone other than the CEO?
```

1    A.    Yes, I'm sure in the staff meeting I
2  told everybody.
3        Q.    Did anyone ever discuss with you whether
4  they were going to go ahead and implement it in
5  their divisions?
6        A.    No.
7        Q.    Did anyone respond to whether it was a
8  good idea or not?
9        A.    A good idea?
10       Q.    In other words, when you presented it in
11 a meeting, did anyone ever respond whether it was a
12 good thing or a bad thing?
13       A.    I don't know, I don't recall.
14       Q.    In one of the questions I asked about
15 whether Mr. Brown ever made a reasonable
16 accommodation request, I was directed to this
17 document, which is Exhibit 12, and do you see that
18 there is a place that you can check if you want a
19 religious accommodation, one line from the bottom?
20       A.    Yes.
21       Q.    Have you ever seen anyone ask for that,
22 check that box off before; have you seen a document
23 where that's checked off?