UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BOBBY T. BROWN,                    )
                Plaintiff          )
                                   )
        v.                         )  CIVIL ACTION NO. 04-30105-MAP
                                   )
F.L. ROBERTS & CO., INC.,          )
d/b/a JIFFY LUBE,                  )
                Defendant          )

MEMORANDUM AND ORDER REGARDING CROSS MOTIONS FOR SUMMARY
JUDGMENT, PLAINTIFF'S MOTION TO STRIKE, PLAINTIFF'S MOTION
TO CERTIFY QUESTIONS TO THE SUPREME JUDICIAL COURT
(Dkt. Nos. 18, 25, 30, & 31)

March 3, 2006

PONSOR, D.J.

## I. INTRODUCTION

Plaintiff Bobby T. Brown has sued Defendant F.L. Roberts & Co. ("F.L. Roberts"), alleging discrimination on the basis of religion in violation of Title VII, 42 U.S.C. § 2000e-2(a) (2006), and Mass. Gen. Laws ch. 151B, § 4 (2006). Plaintiff is a Rastafarian who, in adherence to his religious beliefs, does not shave or cut his hair. He contends that F.L. Roberts failed to accommodate this religious practice after the company implemented a new grooming policy.

Both parties have moved for summary judgment. As the discussion below will disclose, for better or worse, claims of religious discrimination currently face a skeptical legal climate. Controlling authority emphasizes the prerogatives

of employers and protects them from demands for accommoda-
tion that seek more than modest adjustments of normal
procedures and desired image.  A request, such as
Plaintiff's here, that seeks wholesale exemption from a
particular policy, provides an especially insecure
foundation for a claim of discrimination, at least under
federal law.  Thus the court will allow Defendant's Motion
for Summary Judgment on the Title VII claim and deny
Plaintiff's motion.  Plaintiff's claim under Mass. Gen. Laws
ch. 151B, § 4 will be dismissed without prejudice to re-
filing in state court.

    Plaintiff has also filed a Motion to Strike and a Motion
to Certify Questions to the Supreme Judicial Court.  Both
motions will be denied.

## II. <u>FACTS</u>

    The court will begin by analyzing Defendant's Motion for
Summary Judgment; the facts below therefore appear in the
light most favorable to the Plaintiff.  <u>See</u> <u>Pac. Ins. Co. v.</u>
<u>Eaton Vance Mgmt.</u>, 369 F.3d 584, 588 (1st Cir. 2004)
(observing that at summary judgment a court should analyze
the evidence in the light most favorable to the non-moving
party and draw all reasonable inferences for that party).

    Plaintiff has been a practicing Rastafarian since 1991.
Because of his religious beliefs, he does not shave or cut

-2-

his hair.  From 1999 through May 2002, he was employed
intermittently at the Jiffy Lube oil change facility in
Hadley, Massachusetts.  Jiffy Lube is one of several
operational divisions owned by Defendant.  In July 2001,
Plaintiff was hired as a lube technician, and in this
capacity he serviced vehicles while working in both the
upper and lower bays at the Hadley facility.  At times,
Plaintiff was also responsible for greeting arriving
customers and discussing products and services with them.
(See Dkt. No. 23, Pl.'s Statement of Material Facts ¶ 3;
Dkt. No. 20, Brown Aff. ¶ 18.)[1]

In August 2001, Richard C. Smith became Vice President
of Operations for the F.L. Roberts Golden Nozzle Car Wash
and Jiffy Lube divisions.  Seeking to improve sales, Smith
hired a consultant to help him develop and implement
strategies to increase business.  The consultant presented
Smith with data indicating that establishments with a "clean
shaven personal appearance policy" tended to be more
successful.  Smith therefore made plans to implement a new
personal appearance policy in his divisions that would
require employees with customer contact to be clean shaven.
Other divisions at F.L. Roberts did not work with the

---

[1] Defendant contends that Plaintiff was never a greeter or
salesperson, but the evidence would permit a jury to conclude
otherwise.

consultant or implement new appearance policies.  See Dkt. No. 24, Ex. 1, Smith Aff. ¶ 12.)

In the months before the personnel policy went into effect, Plaintiff informed an assistant manager, Bryon Fuller, and a manager, Warren Spears, that he was a practicing Rastafarian, and did not shave or cut his hair because of his religious practice.  See Brown Aff. ¶¶ 12-13; Dkt. No. 21, Fuller Aff. ¶¶ 3-6.)  Fuller told Smith that Plaintiff wanted to maintain customer contact, but could not shave because of his religious beliefs.  See Fuller Aff. ¶¶ 7-8.)  Smith informed Fuller that if Plaintiff did not shave, he would only be allowed to work in the lower bay and could not have customer contact.  See Fuller Aff. ¶¶ 9-10; Brown Aff ¶¶ 14-18.)[2]  According to Defendant, the both upper and lower bay technicians "carry the same levels of responsibility," and their jobs differ only in that "the technicians work on different parts of the vehicle." (Smith Aff. ¶ 9.)

In December 2001, Plaintiff communicated his concerns directly to Smith when Smith came to the Hadley Jiffy Lube to discuss the new policy and distribute the new Employee

_____

[2] The record is somewhat ambiguous about when Smith learned of Brown's beliefs, but a reasonable jury could find that the information reached him before the decision to move Plaintiff to the lower bay was made.

-4-

Handbook.  At this meeting, Plaintiff told Smith about his religious beliefs and explained that he did not think it fair that the "no customer-contact" rule be applied to him when he could not shave because of his religious beliefs. Plaintiff told Smith that he felt he was being discriminated against because of his religion.  Smith responded that he did not have the time to check on the religion of everyone at Jiffy Lube, and that if Plaintiff would not shave, his only option was to work in the lower bay.  See Brown Aff. ¶¶ 15-17.)[3]

The new personal appearance policy went into effect in January 2002.  It was described as follows in the Employee Handbook:

> All customer-contact employees are expected to be clean-shaven with no facial hair (no beards, goatees, or moustaches).  Sideburns must be neatly trimmed and no longer than the bottom of the ear. Hair should be clean, combed, and neatly trimmed or arranged.  Radical departures from conventional dress or personal grooming . . . standards are not permitted.

(Dkt. No. 24, Ex. 2, Employee Handbook.)

---

[3]  Smith contends that there were two meetings with Plaintiff and that he only learned of Plaintiff's religious practice at the second meeting.  Smith does not recall the precise date of the second meeting, but believes it occurred after the policy decision was made.  See Dkt. No. 22, Ex. 3, Smith Dep. 82:11-84:8 (emphasizing this distinction); cf. Smith Aff. ¶¶ 5-7 (establishing only a vague chronology of events). However, based on the evidence offered by Plaintiff, a jury could find otherwise.

After the personal appearance policy was implemented, Plaintiff continued to work at Jiffy Lube because he "needed to keep [his] job." (Dkt. No. 27, Supplemental Brown Aff. ¶ 11.)  Plaintiff worked exclusively in the lower bay and continued to be paid at the same rate; in fact, in January 2002, he received a $1.00 per hour merit increase.  (Smith Aff. ¶ 9.)  With the modification of his position, Plaintiff had no formal customer contact.

According to Plaintiff, working conditions in the lower bay were significantly worse than those in the upper bay. (See Brown Aff. ¶¶ 19-25.)  He was often the only one assigned to the lower bay during his shifts, which made it difficult for him to take breaks.  (Id. ¶¶ 19-21.)  In the winter, the lower bay was very cold, and "it was just like working in a basement without any heat."  (Id. ¶ 22.) Plaintiff was burned by oil and hurt his head several times when he hit it on a pipe in the lower bay.  (Id. ¶¶ 23-24.) Before the new personnel policy went into effect, Plaintiff had rotated through other locations, including the upper and lower bays, but after the change, he was forced to spend all his shifts in the lower bay.  (Id. ¶¶ 9, 25.)

Some time after he was told he would be relegated to the lower bay because of his refusal to shave or cut his hair, Plaintiff visited another of Defendant's divisions, not

supervised by Smith, involving retail food, and noticed that employees at this restaurant had facial hair that would have violated the policy being enforced at the Hadley Jiffy Lube. (See Brown Aff. ¶¶ 27-30.)  The record does not suggest that Plaintiff ever asked, or was qualified, to be transferred to this other division.[4]

### III. CROSS MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When the moving party has properly demonstrated the absence of evidence to support the nonmoving party's case, the "burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor."  Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2001) (quoting DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)).  An issue is "genuine" where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either

---

[4] In support of his state law claim, Plaintiff does maintain that Defendant should have offered a transfer to another F.L. Roberts division as an accommodation.  (See Dkt. No. 19, Pl.'s Mem. Supp. Mot. Summ. J. 19 ("Perhaps [Defendant] could have offered a transfer to a retail convenience store at comparable pay to Mr. Brown, where he would not have to shave.").)

side." <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F.3d
731, 735 (1st Cir. 1995), <u>cert. denied</u>, 515 U.S. 1103
(1995).  A "material" fact is one that "has the potential to
alter the outcome of the suit under the governing law if the
dispute over it is resolved favorably to the nonmovant."
<u>Smith v. F.W. Morse & Co.</u>, 76 F.3d 413, 428 (1st Cir. 1996).

The legal standard for summary judgment is unchanged
when parties file cross motions for summary judgment.  <u>Adria</u>
<u>Int'l Group, Inc. v. Ferre Dev., Inc.</u>, 241 F.3d 103, 107
(1st Cir. 2001).

A. <u>Count I: Title VII Claim</u>.

Title VII of the Civil Rights Act of 1964 prohibits an
employer from discriminating against an employee on the
basis of that employee's religion.  42 U.S.C. § 2000e-2(a)
(2006).  The First Circuit uses a two-part framework to
analyze religious discrimination claims.  <u>Cloutier v. Costco</u>
<u>Wholesale Corp.</u>, 390 F.3d 126, 133 (1st Cir. 2004), <u>cert.</u>
<u>denied</u>, 125 S. Ct. 2940 (2005).  First, a plaintiff must
point to evidence sufficient to show a <u>prima</u> <u>facie</u> case of
discrimination on the basis of religion.  If the plaintiff
is successful, the burden "shifts to the employer to show
that it offered a reasonable accommodation or, if it did not
offer an accommodation, that doing so would have resulted in
undue hardship."  <u>Id.</u>

-8-

Plaintiff cannot make out a claim for religious discrimination under this analysis.  Even accepting that Plaintiff has offered a prima facie case, and that a jury might conclude that Defendant failed to offer a reasonable accommodation -- both points that may be deemed doubtful on this record -- the First Circuit's recent Cloutier opinion makes it clear that Plaintiff's requested accommodation, complete exemption from the grooming policy, would constitute an undue hardship on the employer.

1. Prima Facie Case.

To prove his prima facie case, Plaintiff must show that

(1) a bona fide religious practice conflicts with an employment requirement, (2) he . . . brought the practice to the [employer's] attention, and (3) the religious practice was the basis for the adverse employment decision.

EEOC v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F.3d 49, 55 (1st Cir. 2002).

As a threshold matter, to establish the bona fides of his claim for discrimination, Plaintiff must first show "both that the belief or practice is religious and that it is sincerely held."  Id. at 56.  Title VII's "capacious" definition of religion "leaves little room for a party to challenge the religious nature of an employee's professed beliefs," and because the issue of sincerity rests on an

-9-

evaluation of credibility, it generally is not susceptible to challenge at the summary judgment stage. Id.  In this case, Defendant does not challenge either the sincerity or nature of Brown's beliefs.

Defendant does, however, dispute any suggestion that Brown's religious beliefs conflicted with his job requirements.  Defendant argues that customer contact -- and therefore the related facial hair requirement -- was not an integral part of the job of a lube technician.  Rather, a lube technician's primary responsibility was to work on a vehicle, a job that could be performed from either the upper or lower bay.

Plaintiff contends that prior to the implementation of the new appearance policy, his job involved customer contact.  Thus, because the new policy eliminated his contact with customers, it created a conflict between a job requirement and his religious practices.

Defendant's argument that customer contact was merely incidental to the lube technician position, and not a formal "job requirement," has some force.  Nevertheless, in this Rule 56 context, the court will accept Plaintiff's allegation that customer contact was a job requirement for lube technicians.  Certainly, Plaintiff had regular customer contact before the new grooming policy went into effect.  A

-10-

jury might well find that the acknowledged changes in Plaintiff's work environment and responsibilities when he asserted his right to maintain his religious practice were sufficiently significant and substantial as to mark a pronounced change in the job's requirements.

Plaintiff must next show that he brought his religious practice to his employer's attention.  Plaintiff has clearly met this requirement: he described his religious beliefs to his immediate supervisors, Fuller and Spears, and to the Vice President in charge of his division, Smith.

Finally, Plaintiff must show that his religious practice prompted his employer's adverse employment decision.  This stage of the prima facie analysis is more nuanced.  To be sure, Plaintiff discussed his religious beliefs with Fuller, Spears, and Smith.  All parties agree that Plaintiff's job was modified in response to the fact that he was unwilling to shave or cut his hair.  Thus a reasonable jury could easily find that Plaintiff's religious practice, which his employers knew to include a prohibition on cutting facial hair, was the basis of the decision to move him to the lower bay.

The mere fact that Plaintiff's job was modified, however, is not necessarily sufficient to show that he suffered an adverse employment action.  While it is true

that Plaintiff's duties were circumscribed, he kept his job
and even received a merit pay raise at approximately the
same time the new policy was implemented.  Defendant
therefore argues that because Plaintiff's "essential duties
[were not] altered," there was no adverse employment action.
(Dkt. No. 25, Attach. 2, Defs.' Mem. Opp'n to Pl.'s Mot.
Summ. J. 8.)  Plaintiff, however, contends that his job did
not merely change in some superficial way after the new
policy was implemented, but that it was altered
significantly, and much for the worse.

"Determining whether an action is materially adverse
necessarily requires a case-by-case inquiry" that is "cast
in objective terms." Blackie v. Maine, 75 F.3d 716, 725
(1st Cir. 1996) (discussing adverse employment actions in
the retaliation context); see also id. (noting that
employment discrimination cases premised on disparate
treatment share the materially adverse employment action
requirement).  Even with a case-by-case inquiry,

> some degree of generalization can be attempted.
> Typically, the employer must either (1) take
> something of consequence from the employee, say, by
> discharging or demoting [him], reducing [his]
> salary, or divesting [him] of significant
> responsibilities, or (2) withhold from the employee
> an accouterment of the employment relationship,
> say, by failing to follow a customary practice of
> considering [him] for promotion after a particular
> period of service.

Id. (citations omitted) (emphasis added).  A "purely lateral

-12-

transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." <u>Marrero v. Goya of Puerto Rico, Inc.</u>, 304 F.3d 7, 23 (1st Cir. 2002) (quoting <u>Ledergerber v. Stangler</u>, 122 F.3d 1142, 1144 (8th Cir. 1997)).  Moreover, "a transfer or reassignment that involves only <u>minor changes</u> in working conditions normally does not constitute an adverse employment action." <u>Id.</u> (citation omitted) (emphasis added).

Although Plaintiff was, perhaps understandably, unhappy with his permanent isolation in the lower bay away from customers and felt that it was a less desirable work environment, "[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." <u>Blackie</u>, 75 F.3d at 725.  Plaintiff was divested of some responsibilities, namely his responsibilities in the upper bay and in dealing with customers.  On the other hand, his transfer, if indeed it can be called a transfer, might be considered purely lateral: he continued to work as a lube technician.  Thus the key question is whether the responsibilities Plaintiff lost were "significant" or merely "minor changes."

This rather close question breaks in Plaintiff's favor
for two reasons.

First, it would be distasteful to suggest that employers
can legally single out employees who assert inconvenient but
bonafide religious beliefs and isolate them in unappealing
work environments without "adversely" affecting the
conditions of their employment.  Pay scales and formal job
titles are only part of the conditions of a job; anyone who
has worked knows that opportunities for variety in day-to-
day tasks and reasonably palatable physical surroundings may
make the difference between a tolerable and a flatly
unbearable working environment.  Second, this is a motion
for summary judgment, where close calls go to the non-moving
party; a reasonable jury might find on this record that
Defendant's reaction to Plaintiff's bonafide religious
practice was not a lateral transfer but a sharp diminution
in the quality and substance of Plaintiff's job.  In sum,
though perhaps not overwhelming, the record is sufficient to
demonstrate that Plaintiff suffered an adverse employment
decision and has established a <u>prima</u> <u>facie</u> case of
discrimination on the basis of his religion.

   2. <u>Reasonable Accommodation</u>.

Once Plaintiff has established a <u>prima</u> <u>facie</u> case, the
burden shifts to Defendant to show that it offered Plaintiff

a reasonable accommodation or that doing so would have
resulted in undue hardship. <u>Cloutier</u>, 390 F.3d at 133.  A
reasonable accommodation should "eliminate the conflict
between the employment requirement and the religious
practice," <u>Cloutier v. Costco Wholesale Corp.</u>, 311 F. Supp.
2d 190, 198 (D. Mass. 2004)[5] (quoting <u>EEOC v. Ilona of
Hungary, Inc.</u>, 97 F.3d 204, 211 (7th Cir. 1996)), and should
palliate "the cost to the employer, while also trying to
balance the needs of the employer with the needs of the
employee," <u>id.</u> (citing <u>EEOC v. Universal Mfg. Corp.</u>, 914
F.2d 71, 72-73, 73 n.3 (5th Cir. 1990)).

    The employer's proffered accommodation need not be
either the best alternative, <u>see id.</u>, or the employee's
preferred choice, <u>see id.</u> at 198-99.  Rather, courts
evaluate accommodations on a case-by-case basis to determine
if they are "reasonable."  <u>Id.</u>

    Defendant takes the position that the transfer of
Plaintiff to the lower bay, and the elimination of customer
contact, constituted a reasonable accommodation -- that is,
a fair compromise between the desire of the employer to
maintain its grooming policy and Plaintiff's desire to
follow his religious practice and continue his employment.

---

    [5] Unless otherwise identified, all references to "<u>Cloutier</u>"
in the text refer to the Court of Appeals decision, and not the
district court memorandum and order cited here.

Plaintiff contends that, in offering this supposed accommodation, Defendant in fact "failed completely to offer an accommodation, any accommodation, to Mr. Brown." (Dkt. No. 19, Pl.'s Mem. Supp. Mot. Summ. J. 12.) Rather, Plaintiff says, Defendant simply applied its new employment policy to Plaintiff's situation without any compromise or modification. In effect, Plaintiff argues that unless an accommodation constitutes an actual deviation from an employer's already existing policy, it is not an accommodation at all.

The flaw in this argument is its implication that an employer whose formal policies attempt flexibly to anticipate the diverse needs of its employees will rarely be able to show that it has offered an "accommodation," whereas an employer who adopts rigid rules will have no difficulty offering a minor adjustment to demonstrate that it has deviated from, or relaxed, its policy. This gloss on religious discrimination law wold be both legally untenable and impractical.

As with the issue of whether Plaintiff suffered an adverse employment action at the prima facie stage of analysis, the question of "reasonable accommodation" in this second stage is close. Defendant's contention that the transfer to the lower bay constituted a fair accommodation

has some force.  Arguably, the adjustment allowed Plaintiff
to continue his employment and even receive a wage increase
while maintaining his religious practice and avoiding any
violation of the Defendant's new policy.  It could be argued
that the change protected Defendant's interest in promoting
its business through its new grooming policy while
reasonably respecting Plaintiff's interest in following his
religious practices.  By offering a reasonable
accommodation, Defendant contends, it has met its
obligations under Title VII: "Once an employer offers a
reasonable accommodation, its obligations under Title VII
are satisfied."  Cloutier, 311 F. Supp. 2d at 198 (citing
Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68 (1986)).

     Despite these arguments, the court cannot say with
confidence that no reasonable jury could find that
Defendant, in fact, failed to offer a reasonable
accommodation to Plaintiff's religious practices.  Accepting
the facts in the light most favorable to the Plaintiff, as
the court must at this summary judgment stage, the
Defendant's accommodation restricted Plaintiff to a cold,
uncomfortable, isolated work site, with significantly
diminished responsibilities, as the price of maintaining his
bonafide religious practice.  A ruling that the
accommodation offered on these facts was reasonable as a

-17-

matter of law would constitute too drastic a limitation on the protections offered under Title VII to sincerely held religious beliefs.

　　3. <u>Undue Hardship</u>.

　　While rejecting the transfer to the lower bay as any sort of accommodation, Plaintiff offers no other suggestion as to a proper response to his religious practice except outright exemption from the grooming policy.  <u>See</u> Dkt. No. 19, Pl.'s Mem. 16 (arguing that "[e]xempting Bobby Brown" would not be an undue hardship); <u>see also</u> Brown Aff. ¶ 13 ("I would like to have customer contact without my having to shave"); Dkt. No. 19, Pl.'s Mem. 2 (same); Brown Aff. ¶ 15 (requesting that the appearance policy not be applied to him).)[6]  As <u>Cloutier</u> teaches, this all-or-nothing strategy is dangerous, since it may impose an undue hardship on the employer.

　　The First Circuit has recently made it clear that granting an outright exemption from a neutral dress code "would be an undue hardship because it would adversely

_____

　　[6] In the context of his state law claim, Plaintiff proposes potential accommodations in addition to outright exemption that might have been discussed: <u>e.g.</u>, employment in one of the F.L. Roberts divisions that had a different appearance policy (Dkt. No. 19, Pl.'s Mem. 19) or an upper bay position that did not involve sales or greeting (<u>id.</u>).  There is no indication in the record that Plaintiff ever suggested, or indeed would even have been interested in, these alternatives prior to this litigation.

affect the employer's public image." <u>Cloutier</u>, 390 F.3d at
136.  This sentiment finds support in the Supreme Court's
holding, in a religious discrimination case, that an
accommodation that forces an employer to "bear more than a
de minimis cost . . . is an undue hardship."[7]  <u>Trans World
Airlines, Inc. v. Hardison</u>, 432 U.S. 63, 84 (1977).
Significantly, the First Circuit has emphasized that the
"cost" to the employer in this context -- i.e., the measure
of hardship -- is not to be assessed in purely economic
terms, <u>Cloutier</u>, 390 F.3d at 134, and that an employer need
not have actually attempted an accommodation in order to
prove undue hardship, <u>id.</u> at 135.

    In <u>Cloutier</u>, the plaintiff, a Costco employee who wore
an eyebrow ring, was suspended after she failed to comply
with Costco's revised dress code.  Cloutier stated that she
was a member of the Church of Body Modification and that
facial piercings, which were barred under Costco's new dress
code, were part of her religion.  Costco offered to let

_____

    [7]  Interestingly, although the Court has sharply limited
employee protection from religious discrimination under Title
VII, the Court has been more generous under the Religious
Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb-1(b)
(2006), in its protection of religious practices against
<u>governmental</u> intrusion.  <u>See</u> <u>Gonzalez v. O Centro Espírita
Beneficente União do Vegetal</u>, No. 04-1084, 2006 WL 386374 (Feb.
21, 2006) (prohibiting criminal prosecution based on use of
hallucinogenic tea during a religious service).

Cloutier return to work if she covered her facial jewelry with band-aids or replaced the jewelry with plastic retainers that would prevent the piercings from closing up during the work day.  Cloutier rejected both accommodations because according to her religious beliefs she was required to display her facial jewelry openly at all times.  <u>Id.</u> at 128-30.

In affirming the dismissal of Cloutier's claim by the district court, the Court of Appeals focused on the question of undue hardship.[8]  Courts, it noted, "have long recognized the importance of personal appearance regulations, even in the face of Title VII challenges."  <u>Id.</u> at 135.  Further, "employees reflect on their employers," especially where the employees "regularly interact with customers."  <u>Id.</u>

> Courts considering Title VII religious discrimination claims have <u>also upheld dress code policies that . . . are designed to appeal to customer preference or to promote a professional public image</u>.  The majority of religious

---

[8] The court assumed, "<u>arguendo</u>, that Cloutier established a <u>prima facie</u> case sufficient to shift the burden to Costco." <u>Cloutier</u>, 390 F.3d at 133.  The lower court had granted judgment on the ground that the defendant had offered a reasonable accommodation (the bandage or clear retainer) as a matter of law.  The Court of Appeals declined to adopt this rationale because it was unclear from the record whether the accommodation was first offered only at the EEOC mediation stage.  <u>Id.</u> at 133-34.  The potential question raised by these facts, "whether a post-termination offer extended during the EEOC mediation process can be a reasonable accommodation," presented "difficult issues" that the court chose to avoid. <u>Id.</u> at 134.

> discrimination cases in this arena appear to
> involve <u>policies regulating facial hair</u>.

<u>Id.</u> at 136 (citation omitted) (emphasis added).  Where an

employee will accept "no accommodation short of an outright

exemption from a neutral dress code," granting "such an

exemption would be an undue hardship because it would

adversely affect the employer's public image."  <u>Id.</u>

The court also rejected Cloutier's argument that

allowing an exemption would present no special burden on

Costco because other employees had, in fact, previously

violated or were continuing to violate the appearance

policy.

> [T]here is an important distinction between an
> employee who displays facial jewelry unnoticed in
> violation of the dress code and one who does so
> under an exemption from the dress code.  In the
> first scenario, Costco can instruct an employee to
> remove facial jewelry as soon as it becomes aware
> of a violation.  In the second scenario, Costco
> forfeits its ability to mandate compliance and thus
> loses control over its public image.  That loss . .
> . would constitute an undue hardship.

<u>Id.</u> at 137.

Like <u>Cloutier</u>, this case concerns a plaintiff who seeks

an exemption from a neutral appearance policy.  Plaintiff

attempts to distinguish <u>Cloutier</u> by focusing on the

distinction made by the First Circuit between known and

undetected dress code violations.  He points to the fact the

Defendant actually <u>knew</u>, at the time it refused to

accommodate Plaintiff's religious practice, that employees

at other divisions of F.L. Roberts were "totally exempted" from the appearance policy (Dkt. No. 19, Pl.'s Mem. 14.), and thus argues that exempting Plaintiff "would only be following the policy F.L. Roberts implements in the retail convenience division, not creating a single episode of exemption." (Id. at 16.).

In response, Defendant points to the undisputed fact that F.L. Roberts did not adopt a company-wide policy and then exempt all divisions other than Jiffy Lube. Rather, each division, and each division manager, was authorized to operate and adopt policies suited to its particular situation. Smith hired a consultant and, based on the consultant's recommendation, adopted a new policy for the divisions for which he was responsible; other divisions did not participate in this process.

Nothing in the law governing religious discrimination, or any other species of employment law, prohibits a company from adopting policies that differ from division to division. That some or all of Defendant's other divisions had no such grooming policy is irrelevant. The question is whether a blanket exemption from the grooming policy in effect in the division in which Plaintiff worked would constitute an undue hardship. Based on Cloutier and Hardison, the answer to this question must be in the

-22-

affirmative.

As Chief Justice Roberts has recently observed in O
Centro Espírita, the task of striking "sensible balances" in
accommodating religious practices, whether against
governmental interests or the interests of private
employers, is not "an easy one." Gonzalez v. O Centro
Espírita Beneficente União do Vegetal, No. 04-1084, 2006 WL
386374, at *14 (Feb. 21, 2006). It is impossible to make
this ruling dismissing Plaintiff's case here without a sense
of uneasiness. If Cloutier's language approving employer
prerogatives regarding "public image" is read broadly, the
implications for persons asserting claims for religious
discrimination in the workplace may be grave. One has to
wonder how often an employer will be inclined to cite this
expansive language to terminate or restrict from customer
contact, on image grounds, an employee wearing a yarmulke, a
veil, or the mark on the forehead that denotes Ash Wednesday
for many Catholics. More likely, and more ominously,
considerations of "public image" might persuade an employer
to tolerate the religious practices of predominant groups,
while arguing "undue hardship" and "image" in forbidding
practices that are less widespread or well known.

Perhaps the intent of Cloutier was narrower than might
appear; the case may be read to turn on Cloutier's apparent

-23-

demand for a complete exemption from the facial piercing policy, rather than on Costco's insistence on virtually complete autonomy in shaping its public image.  Indeed, many religious discrimination cases, including Cloutier, appear to rely on decisional grounds other than mere employer preference regarding image.  For example, employers' appearance "regulations are often justified with regard to safety concerns."  Cloutier, 390 F.3d at 135 (citing Bhatia v. Chevron U.S.A., Inc., 734 F.2d 1382 (9th Cir. 1984)).

Indeed, three cases cited in Cloutier in support of deference for employer preferences regarding image may be interpreted, on closer scrutiny, to rely on narrower grounds.  In Hussein v. The Waldorf-Astoria, 134 F. Supp. 2d 591 (S.D.N.Y. 2001), aff'd, 31 Fed. Appx. 740 (2d Cir. 2002), although the district court acknowledged that courts have "found that clean-shavenness is a bona fide occupational qualification in certain businesses," Hussein, 134 F. Supp. 2d at 599 (emphasis added), the court ultimately concluded that an employer was not required to comply with an employee's "on-the-spot demand for an exception," Hussein, 134 F. Supp. 2d at 598.  See id. at 599 ("Here, in view of the circumstances in which Hussein first raised the issue of his religion, and the valid, non-discriminatory reasons for the . . . rule . . . a

-24-

reasonable jury could only conclude that [the defendant] was not obliged to accommodate [the plaintiff's] last-minute request for an exemption from the no-beard policy."); cf. Cloutier, 390 F.3d at 136 (citing Hussein for the proposition that "[c]ourts considering Title VII religious discrimination claims have . . . upheld dress code policies that . . . are designed to appeal to customer preference or to promote a professional public image").

In Daniels v. City of Arlington, 246 F.3d 500, 506 (5th Cir. 2001), cert. denied, 534 U.S. 951 (2001), and Wilson v. U.S. West Communications, 58 F.3d 1337 (8th Cir. 1995), the courts relied on narrow determinations about accommodation. See Daniels, 246 F.3d at 506 (finding, as in Cloutier, that an employee's request for a blanket exemption from the employer's policy was unreasonable as a matter of law); Wilson, 58 F.3d at 1341-42, 1342 n.3 (holding that employer offered a reasonable accommodation and noting, without reaching the issue, that accommodating an employee's religious vow to wear a graphic anti-abortion button would have presented an undue hardship).

The only other religious discrimination and personal appearance case cited by the First Circuit takes a slightly broader approach. In EEOC v. Sambo's of Ga., Inc., 530 F. Supp. 86 (N.D. Ga. 1981), the district court rejected a

-25-

challenge by a Sikh employee to a restaurant's appearance
policy, relying on evidence that clean-shaven employees were
necessary to the success of a restaurant directed at the
family trade.  The court relied on factual findings
regarding customer reaction in the relevant market, stating
that customers had been shown to have

> a simple aversion to, or discomfort in dealing
> with, bearded people; . . . a concern that beards
> are unsanitary or conducive to unsanitary
> conditions; or . . . a concern that a restaurant
> operated by a bearded manager might be lax in
> maintaining its standards as to cleanliness and
> hygiene in other regards.

530 F. Supp. at 89.  Further, citing guidelines issued by
the Georgia Department of Human Resources, the court noted
that "sanitation is a legitimate concern in the food service
industry."  See id. at 89-90.  Nevertheless, despite
examining specific concerns that suggested a narrower basis
for any decision on the issue, the district court took a
broad view of the law:

> Even assuming that the defendants' justification for the
> grooming standards amounted to nothing more than an
> appeal to customer preference, which is not the case, it
> is not the law that customer preference is an
> insufficient justification as a matter of law.

Id. at 91 (emphasis added) (relying on Woods v. Safeway
Stores, Inc., 420 F. Supp. 35, 43 (E.D. Va. 1976), aff'd,
579 F.2d 43 (4th Cir. 1978), cert. denied, 440 U.S. 930
(1978), where the court found that in the retail food

-26-

industry, "overall store hygiene and an appearance of cleanliness is an important aspect of customer preference").

The proper balancing of bonafide religious practices against an employer's policy decisions remains a difficult issue, as the struggles exhibited by these cases demonstrate. Still, it is a matter of concern when the balance appears to tip too strongly in favor of an employer's preferences, or perhaps prejudices. An excessive protection of an employer's "image" predilection encourages an unfortunately (and unrealistically) homogeneous view of our richly varied nation. Worse, it places persons whose work habits and commitment to their employers may be exemplary in the position of having to choose between a job and a deeply held religious practice. It is unclear whether the decision being made in this memorandum strikes the balance properly, but there is no question that it is compelled by controlling authority.

B. Count II: State Claim.

Plaintiff has also brought a claim for religious discrimination under Mass. Gen. Laws ch. 151B, § 4. Defendant seeks summary judgment on this count. As the First Circuit noted in Cloutier,

> Massachusetts courts do not appear to have specifically considered whether exempting an employee from a dress code constitutes undue hardship. Where there are gaps in the application

-27-

> of Chapter 151B, courts turn to case law
> interpreting Title VII. <u>Wheatley v. Am. Tel. &
> Tel. Co.</u>, 636 N.E.2d 265, 268 (Mass. 1994) ("It is
> our practice to apply Federal case law construing
> the Federal anti-discrimination statutes in
> interpreting G.L. c. 151B.").

390 F.3d at 138. Although the state may choose to follow

the federal standard, it is possible in this case that state

law may be more generous to Plaintiff than federal law.

(<u>See</u> Dkt. No. 19, Pl.'s Mem. 16-20 (setting forth

Plaintiff's argument that state law requires a different

showing by Defendant).)

The exercise of "supplemental jurisdiction is left to

the sound discretion of the district court." <u>Pejepscot</u>

<u>Indus. Park, Inc. v. Me. Cent. R.R. Co.</u>, 215 F.3d 195, 206

(1st Cir. 2000) (citation omitted). A court may decline to

exercise such jurisdiction when it "has dismissed all claims

over which it has original jurisdiction." 28 U.S.C. §

1367(c) (2006). In this case, the court will grant summary

judgment in favor of Defendant only on the sole federal

claim. Plaintiff's state law claim will therefore be

dismissed without prejudice to allow the state to resolve

the relevant issues. <u>See United Mine Workers of America v.</u>

<u>Gibbs</u>, 383 U.S. 715, 726-27 (1966). The difficult issues

raised by this case amply justify a particularly scrupulous

examination of any possible differences in the protections

offered by federal and state law. This analysis may be

performed most knowledgeably by the judiciary of the
Commonwealth.

C. Plaintiff's Motion for Summary Judgment.

Because the court will allow Defendant's Motion for
Summary Judgment with regard to Count I and dismiss Count II
without prejudice, Plaintiff's Motion for Summary Judgment
will be denied.

## IV. MOTION FOR AN ORDER TO CERTIFY

Plaintiff's Motion to Certify Questions to the Supreme
Judicial Court will be denied.  Because this court will
dismiss Plaintiff's state law claim without prejudice,
Plaintiff will, if he so desires, have an adequate
opportunity to pursue these questions of state law in state
court.

## V. MOTION TO STRIKE

Plaintiff has moved to strike any reference in the
Affidavit of Richard C. Smith, or in any other evidence
provided to this court, to any alleged ground for his May
2002 termination.  This motion will be denied as moot,
because the court has not relied on any such evidence in its
ruling on the summary judgment motions.

## VI. CONCLUSION

For the reasons outlined above, the disposition of the

motions in this case is as follows.  Defendant's Motion for Summary Judgment (Dkt. No. 25) is ALLOWED with prejudice as to Count I, and otherwise DENIED.  Plaintiff's Motions for Summary Judgment, To Strike, and To Certify Questions to the Supreme Judicial Court (Dkt. Nos. 18, 30, & 31) are all DENIED.  Count II is DISMISSED WITHOUT PREJUDICE, as a matter of the court's discretion.  It may be pursued, if Plaintiff desires, in state court.  This case can now be closed.

It is So Ordered.


/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge